Circuit Court for Prince George's County
Case No. CAL15-25618
Case No. CAL15-25619
Case No. CAL15-25620
Case No. CAL16-00341

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1056

September Term, 2016

---

J.H., *ET AL.*

v.

PRINCE GEORGE'S HOSPITAL CENTER

---

Leahy,
Reed,
Rodowsky, Lawrence F.,
    (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Leahy, J.

---

Filed: July 27, 2017

Suffering from the harmful effects of mental illness, J.H., C.B., M.G., and B.N. (collectively "Appellants"), were brought to Prince George's Hospital Center[1] ("Appellee" or the "Hospital") on separate occasions for emergency mental health evaluations to determine whether each should be admitted for involuntary psychiatric treatment. Each Appellant was afforded a hearing before an administrative law judge ("ALJ"), during which their counsel argued for their release on the ground that the Hospital failed to comply in various respects with the preadmission procedures set out in Maryland Code (1982, 2015 Repl. Vol.), Health-General Article ("Health-Gen."), § 10-601 *et seq.*[2] Each ALJ concluded the evidence established that Appellants qualified for involuntary admission to the Hospital's inpatient psychiatric unit in accordance with Health-Gen. § 10-632(e), and that none of the alleged preadmission procedure violations warranted Appellants' release.

Counsel filed a petition for judicial review for each Appellant and a motion to consolidate their cases in the Circuit Court for Prince George's County. The circuit court

---

[1] Prince George's Hospital Center is a member institution in the Dimensions Healthcare System. Dimensions Healthcare System is a not-for-profit healthcare system owned by Dimensions Health Corporation. Dimensions Healthcare System, https://www.dimensionshealth.org/about-us/ (last visited July 25, 2017).

[2] The preadmission procedures include but are not limited to: 1) a physician must evaluate an individual within 6 hours of arrival to the hospital (Health-Gen. § 10-624(b)(2)); 2) the hospital must give individuals written notice of their admission status within 12 hours of the individual's initial admission (Health-Gen. § 10-631(b)); 3) the hospital may not keep an individual in the emergency room in excess of 30 hours (Health-Gen. § 10-624(b)(4)); and 4) the involuntary admission hearing must be held within 10 days of the date of the initial confinement (Health-Gen. § 10-632(b)). These procedures are discussed in detail in Part I.C *infra*.

granted the motions to consolidate and, after argument, affirmed the ALJs' decisions with respect to each Appellant.

Before this Court, Appellants challenge the ALJs' decisions and present issues[3] derivative of one overarching question: During involuntary admission hearings are hospitals required to affirmatively prove compliance with preadmission procedures beyond the statutorily prescribed involuntary admission elements contained in Health-Gen. § 10-632(e)?

For the reasons that follow, we affirm the decisions ordering the involuntary admission of each Appellant. We hold that at an involuntary admission hearing, the Hospital has the burden to prove the involuntary admission elements enumerated in Health-Gen. § 10-632(e) by clear and convincing evidence, and that the patient has the burden, pursuant to Code of Maryland Regulations ("COMAR") 10.21.01.09G(2), to raise with particularity any alleged violations of preadmission procedures. Once raised, the burden

---

[3] Appellants' questions as stated in their brief read:

1. "In each case, did the ALJ err in ordering involuntary admission without first ensuring compliance with statutory requirements intended to safeguard patients' due process rights?"
   a. "Before ordering involuntary admission, must an ALJ determine whether the evidence establishes compliance with the requirements in Title 10, subtitle 6, of the Health-General Article of the Maryland Code?"
   b. "Does the Hospital have the burden of proving compliance with these statutory requirements?"
   c. "Did the Hospital fail, in each case, to prove compliance with these statutory requirements?"
   d. "Did the failure to prove statutory compliance in each case rob the ALJ of jurisdiction or raise a due process concern substantial enough to prohibit involuntary admission?"

2

shifts to the Hospital to demonstrate, by a preponderance of the evidence, its compliance with the particular procedural violations raised.

## BACKGROUND

### A.    Involuntary Admission Hearings

The following is a summary of the testimony presented at each hearing and the ALJ's findings as to each Appellant.

### 1.    J.H.'s Involuntary Admission Hearing

Before J.H. was involuntarily admitted into the psychiatric unit at the Hospital, she lived with her daughter, K.H., and her two-year-old granddaughter.  K.H testified that she witnessed her mother's ability to care for herself decline over the last several years.  J.H. was not taking her medications for her psychiatric and other medical conditions, and refused to attend scheduled doctors' appointments.  After her mother became "very aggressive and verbally abusive," K.H. filed a petition for the emergency evaluation of J.H. on September 2, 2015.  That same day, the police brought J.H. to the Hospital's emergency room for evaluation.

On September 16, 2015, an ALJ held an involuntary admission hearing for J.H.  At the outset of the hearing, J.H.'s counsel stated that he "[would] be bringing up that the notice of admission status and the detention in the emergency room both exceeded the time limits[.]"

Dr. Prasad, J.H.'s treating physician, testified for the Hospital.  In regard to J.H.'s eligibility for admission under Health-Gen. § 10-632(e)(2)(i)-(v)—the controlling statute in this case—Dr. Prasad testified that J.H. has been diagnosed with chronic schizophrenia,

3

diabetes, and hypertension. She had been admitted to the Hospital several times during the year-and-a-half prior to the hearing. He explained that upon discharge, J.H. would refuse to comply with her treatment regimen of psychiatric medication and outpatient care, resulting in her readmission. J.H. failed to maintain her personal hygiene, often stayed in bed, and only occasionally ate meals. Dr. Prasad presented J.H. with the option to voluntarily admit herself, but she refused because she was unable to "appreciate[] the nature of her mental illness and need for current treatment." He testified that J.H. also refused to accept outpatient treatment for her mental illness and medical conditions, which, if left untreated, posed a considerable threat to her health. In Dr. Prasad's professional opinion, J.H. needed institutional care and there was no less restrictive treatment available for her.

Next, Dr. Prasad testified that J.H. was certified by two physicians and given notice of her admission status. He did not know how long J.H. waited in the emergency room and said that he would need to "look in the record" for that information. Neither counsel revisited this open issue. In fact, on cross-examination, J.H.'s counsel asked only one question: "How did my client get to the hospital, Doctor?"

K.H. testified that she could not provide the care J.H. required and that J.H. could no longer live with her. K.H. also raised a concern regarding her two-year-old daughter's safety, referencing J.H.'s cavalier attitude toward storing and disposing of her prescription medications in places accessible by the child.

After the conclusion of the Hospital's case, J.H's counsel moved to have her released. He alleged that J.H.'s involuntary admission hearing was not conducted within

4

10 days of J.H.'s initial confinement. He also stated that the Hospital failed to demonstrate when the certifications were completed, or when the Hospital gave J.H. notice of her admission status, or how long J.H. was in the emergency room. Because the Hospital failed to comply with the applicable preadmission procedures, counsel for J.H. argued the ALJ was deprived of jurisdiction to conduct the involuntary admission hearing.

The ALJ denied J.H.'s motion for release, finding that although "the time periods aren't really crystal clear . . . [J.H.] is having her hearing in a timely fashion."

J.H. was the only witness offered in support of her case. J.H. testified that she intended to continue with her outpatient psychiatric and medical treatment, but she no longer required medication for schizophrenia or diabetes. Her primary reason for no longer taking Haldol—a prescription for schizophrenia—was the unpleasant side-effects. As for the medication for her other medical conditions, J.H. said she no longer had diabetes or high blood pressure because "[she] lost about 79 pounds and that put [her] sugar right."

With respect to the alleged preadmission procedure violations, the ALJ declined to make a finding on J.H.'s admission date because "[h]er admission date wasn't testified to[.]" Then the ALJ made express findings for each involuntary admission element the Hospital is required to prove pursuant to Health-Gen. § 10-632(e)(2)(i)-(v).[4] First, the ALJ found that J.H. "has a mental disorder diagnosed as schizophrenia chronic." Second, the ALJ determined that J.H. requires inpatient care and treatment. Regarding the third

---

[4] We note that Health-Gen. § 10-632(e)(2) contains six elements; however, the last element only applies to individuals who are 65 or over. Because none of the Appellants in the underlying cases are 65 years of age or older, the ALJs were only required to consider the first five elements.

5

element, the ALJ found that although J.H. "is mentally ill and unpredictable, [] she hasn't really done anything to anybody . . . that would make her dangerous to others." But he did find that she posed a danger to herself, reasoning that he did not

> . . . believe the patient's testimony that she is no longer diabetic. Her daughter testified that she has chronic kidney disease, which is often caused by diabetes. She also has hypertension, and the diabetes, both of which . . . can kill you if they're not controlled and treated.
> Not bathing, not eating, the patient doesn't look like she's starving, but . . . not taking your medication for medical conditions, thinking that you don't have these medical conditions, which are serious and life threatening, does threaten your own life and safety and it's caused by [J.H.'s] mental illness.

Fourth, he concluded that J.H. was "unwilling and unable to be voluntarily admitted." Lastly, the ALJ reasoned that "there [wa]s no less restrictive form of intervention for her [based on] Dr. Prasad's testimony about her continued history of being discharged and not taking medication and relapsing." After reciting his findings, the ALJ ordered the involuntary admission of J.H.

## 2. C.B.'s Involuntary Admission Hearing

Before C.B. was involuntarily admitted into the psychiatric unit at the Hospital on September 12, 2015, she lived alone. A.B., her father, testified that although he and her mother helped C.B. with cutting the grass and grocery shopping, C.B. was not able to maintain the cleanliness of her home. On one visit, A.B. noticed that dirt was visible on the floors and the kitchen sink was clogged and the "water smell[ed] like it [had] been in there for three months." A.B. became increasingly concerned for his daughter's wellbeing after one shopping trip she went on with her mother. Apparently C.B. opened the car door while the car was moving and got out. A.B. also explained that one grocery store banned

6

C.B. for three years after an incident in which she became verbally aggressive with other store patrons. After observing C.B.'s "gradual deterioration," C.B.'s parents filed a petition for emergency evaluation on September 11, 2015, and brought her to the Hospital.

On September 16, 2015, an ALJ held an involuntary admission hearing to determine whether C.B. should be involuntarily admitted for psychiatric treatment. C.B. was not present at the hearing. At the outset of the hearing, C.B.'s counsel requested her release, vaguely asserting there was an error in the emergency petition and notice of admission.

The Hospital called as its witnesses Dr. Mirmirani, director of psychiatric services and C.B.'s treating physician, and A.B. Dr. Mirmirani testified to the circumstances of C.B.'s admission and emergency evaluation. When evaluating C.B., Dr. Mirmirani was not able to have a meaningful conversation with C.B. regarding voluntary admission because "she [wa]s very psychotic, very preoccupied, refused to engage in conversation[,]" and "she has . . . no insight, very poor judgment about her psychiatric condition[.]" Dr. Mirmirani confirmed that two physicians signed the certification and that C.B. was notified of her rights and refused to sign the consent as reflected in the following testimony:

| [By counsel]: | . . . Before you is the petition for emergency evaluation filed by [C.B.'s] father? |
|---|---|
| Dr. Mirmirani: | That's correct. |
| [By counsel]: | And the date of that petition? |
| Dr. Mirmirani: | Is 9/11/2015. |
| [By counsel]: | Okay. Does the record reflect that she was given her notification of admission status and rights? |
| Dr. Mirmirani: | Yes, ma'am. |

7

| [By counsel]: | Did she sign it? |
|---|---|
| Dr. Mirmirani: | She refused to sign. |
| [By counsel]: | Thank you. Could you please read what -- what it says? What the completer of this document had [sic] wrote? |
| Dr. Mirmirani: | Yes. She said she refused, is paranoid, and she "said she was tricked." |

\* \* \*

| [By counsel]: | Does the record reflect that two qualifying physicians did the certifications for [C.B.]? |
|---|---|
| Dr. Mirmirani: | Yes, ma'am. |
| [By counsel]: | Was [C.B.] given her notice of hearing today? |
| Dr. Mirmirani: | Yes. Yes, ma'am. |
| [By counsel]: | Does the record reflect that? |
| Dr. Mirmirani: | Yes, ma'am. |

Dr. Mirmirani then testified to the Health-Gen. § 10-632(e)(2)(i)-(v) involuntary admission elements. Dr. Mirmirani indicated that C.B. was diagnosed with chronic schizophrenia. Dr. Mirmirani prescribed anti-psychotic medication to C.B., but she refused to take the medication. He testified that C.B. "walk[s] around . . . talking to herself" and is "under the influence of internal stimuli . . . which is a psychotic process that she's responding [to] and . . . [she] continues to be psychotic." Although she had wandered to the neighbor's home and the shopping center and caused a disturbance, Dr. Mirmirani testified that he did not believe C.B. presented a risk to others. However, Dr. Mirmirani

8

opined that C.B. was a danger to herself because she had lost a lot of weight, was not eating, and was preoccupied with her "internal psychotic process." He also opined that C.B. required institutional treatment because she was not caring for herself and her psychosis rendered her "incapable of even believing that she has mental illness and needs treatment." Based on C.B.'s six or seven year history of mental illness and severe psychosis, Dr. Mirmirani testified that there was no less restrictive alternative.

On cross-examination, C.B.'s counsel inquired into the alleged procedural error in the petition filed by C.B.'s father:

| | |
|---|---|
| [C.B.'s counsel]: | Doctor, you mentioned there's an emergency petition. The question number 10 on the emergency petition which says the petitioner or the person to be evaluated is a danger. What does it say as to what her danger is? |
| Dr. Mirmirani: | Well, it says she's disturbing the neighbors - - |
| [C.B.'s counsel]: | Is that number 9, Doctor, or is - - |
| Dr. Mirmirani: | Number 10, I'm sorry. |
| [C.B.'s counsel]: | Number 10, her dangerousness, it says is not applicable. |
| Dr. Mirmirani: | Not applicable. |

C.B.'s counsel then asked a set of questions, presumably to show that C.B.'s name and status did not appear on the notice of admission status form. Dr. Mirmirani clarified on redirect, however, that the patient's first name was at the end of the notice of admission status form, where, below the nurse's signature it read "I certified that I have informed [C.B.] of his or her admission status and rights [in] accordance with the provision of Health

9

General Article 10 and Criminal Procedure Article, Notice of Admission." During the hearing, C.B.'s father also testified that his daughter posed a danger to herself and others, and the "not applicable" "could have been a mistake."

After the close of the Hospital's case, C.B.'s counsel did not call any witnesses and proceeded directly to closing arguments. C.B.'s counsel demanded C.B.'s release, reasserting that there was an error in the emergency petition because it did not state how C.B. was a danger to others, and alleging generally that the Hospital did not prove compliance with all relevant preadmission procedures. He also argued, for the first time, that there was no evidence that the petition had been presented to a judge, or that Dr. Mirmirani saw C.B. within 48 hours of her admission.

The ALJ denied C.B.'s motion for release, finding that the Hospital demonstrated that the proper procedures were followed. The ALJ noted that no one from the patient's side testified to any alleged errors, and that "if the patient wishes to challenge [the Hospital's compliance with preadmission procedures], it's up to the patient to present evidence that the procedures were not, in fact, followed and that the error was of severe magnitude to require release because no other remedy would be sufficient and that has not been done in this case." With respect to the alleged error in the petition, the ALJ determined the error did not require C.B.'s release because the petition was completed by A.B. and noted that "I'm willing to assume that [the petition] was summoned by a judge because [A.B.] doesn't have any authority to [] have the police or the sheriff pick up his daughter off the street and bring her into - - to an emergency room for evaluation. When a civilian fills out that petition, the court has to approve it."

10

Next, the ALJ made express findings for each involuntary admission element enumerated in Health-Gen. § 10-632(e)(2)(i)-(v). First, the ALJ found that C.B has chronic schizophrenia. Then, he determined that C.B. required institutional care and treatment. With respect to the third element, the ALJ found that C.B. was a danger to herself because of her inability to care for herself, and because she "got out of a moving car" and was so "disruptive and hostile" that a grocery store banned her. Fourth, he concluded that C.B "is unwilling to be voluntarily admitted." Lastly, the ALJ determined that

> there is no less restrictive form of intervention that's available for her that's consistent with her welfare because she does not cooperate with mental health professional[s] except when she's forced to in a hospital.
> Dr. Mirmirani said his plan is to take her to a clinical review panel and have her involuntarily medicated if necessary. [A.B.] testified that she hasn't seen an outpatient psychiatrist or taken her medications in the last six months at least and certainly she has decompensated.

After reciting his findings, the ALJ ordered the involuntary admission of C.B.

### 3. M.G.'s Involuntary Admission Hearing

A police officer found M.G. on the street, walking shoeless in traffic. She appeared confused and was almost hit by a car. The officer brought M.G. to the emergency room of the Hospital and filed an emergency petition for M.G.'s involuntary admission in September 2015.[5] On September 16, 2015, an ALJ held an involuntary admission hearing for M.G. In his opening statement, M.G.'s counsel alleged the Hospital violated the

---

[5] The exact dates are not in the record. The emergency petition, certificates for involuntary admission, and the petition for involuntary admission were not admitted as documentary evidence at the involuntary admission hearings. The circuit court noted in its opinion: "[a]lthough it is not insurmountable to require the Hospital to enter such medical records at the IVA hearing, the statutory scheme as written does not require this."

11

preadmission procedures by keeping M.G. in the emergency room for 41 hours.

The Hospital called Dr. Mirmirani, the director of psychiatric services and M.G.'s treating physician, as its only witness. Dr. Mirmirani diagnosed M.G. with substance-induced psychosis[6] and psychotic chronic mental illness. M.G. may have had an additional mental illness, according to Dr. Mirmirani, however, M.G. was unable to relate her medical history.

On admission, M.G. was psychotic and agitated. The Hospital staff had to restrain M.G. and administer medication intramuscularly. On the day of the hearing, M.G. was still experiencing psychosis but had agreed to voluntarily take the prescribed antipsychotic medication. Despite M.G.'s improvement—resulting from the medication and treatment—Dr. Mirmirani testified that M.G. did not agree to voluntarily admit herself and that she "[had] very poor judgment about the need for psychiatric care at this time." Dr. Mirmirani testified that M.G. was a threat to her own safety because the officer found her incoherent, walking in the street and that she was still experiencing psychosis at the time of the hearing. He opined that M.G. requires institutional care and treatment for daily monitoring to stabilize her psychosis and to accurately diagnose her additional mental illnesses.

M.G.'s counsel did not call any witnesses, moved to release M.G., and argued in closing that M.G.'s time in the emergency room exceeded the statutorily prescribed time, and "[t]here's no evidence that [M.G.] . . . was ever certified here, whether [M.G.] was ever given notice of her admission status, [and notice] of this hearing." Maintaining that

---

[6] The substance was phencyclidine, or "PCP."

the preadmission procedures are jurisdictional, M.G.'s counsel argued that she must be released unless the Hospital could demonstrate that it complied with the preadmission procedures.

The ALJ agreed that the Hospital did not present evidence regarding the procedural issues. Caught off-guard by M.G.'s procedural error arguments, the Hospital's counsel requested clarification on the specific procedural issues. A lengthy colloquy then ensued between the parties and the ALJ. The ALJ reiterated his prior conclusion that the Hospital did not present evidence regarding the procedural issues, which "are affirmative obligations by . . . the Hospital." The ALJ told the Hospital that the procedural issues "are necessary to make a case for me to find that the patient needs to stay here. Anyone can testify to that effect, but I think you need to alert your witnesses that those items are necessary." Acknowledging that the law and medicine dictated conflicting outcomes, the ALJ explained:

> I can't really have the Hospital reopen their case because [M.G.] didn't present a case. [She] just presented argument. [She] didn't present any evidence, so there's no evidence for the Hospital to rebut. So, legally, I must find that [M.G.'s counsel] is correct that the necessary procedures have not been shown to have been followed, and that [M.G.] is entitled to be discharged.

The Hospital's counsel objected, arguing that "[M.G.] clearly is not in any condition to leave the hospital at this time[.]" The ALJ then determined that "[t]he only remedy that [he] could grant would be to allow the Hospital to reopen their case and present that evidence." The ALJ permitted the Hospital to continue its direct examination of Dr. Mirmirani on the limited issue of "how [M.G.] came to be admitted," reasoning that:

13

[M.G.] raises a preliminary issue, the amount of time that she allegedly spent in the emergency room. It's not up to the Hospital to rebut that point during your case in chief. That's an affirmative defense, if you will, by which [M.G.] could move for release based on being outside the statutory limits in the emergency room. So, I don't fault the Hospital for not addressing that during their presentation.

As an administrative law judge, my function is basically to try to dispense low level justice and do the best for all the parties. I don't think it would be good for either the patient or the hospital to discharge her based on the possible technical deficiency and the hospital's evidence.

. . . I'll allow [the Hospital] to reopen [its] case if you want to recall Dr. Mirmirani on the issue of how [M.G.] came to be admitted here to this unit.

. . . I'll allow cross examination to include the issue of how [M.G.] came to the emergency room and how long she was there before she was transferred. I can only assume that those answers are in the medical records.

The Hospital's counsel then recalled Dr. Mirmirani, who explained that the Hospital's emergency room differed from others in that it had a two-step process. The first step is triage and initial assessment by an emergency room physician in the main emergency room. The second step is a 23-hour stabilization unit where the patient is treated by a psychiatrist. In M.G.'s case, she was treated by both an emergency room physician and Dr. Ganjoo, a psychiatrist. Dr. Mirmirani was not able to testify to the length of M.G.'s stay in either the first or second step.

Each party then presented closing arguments. M.G.'s counsel reiterated that the ALJ should grant M.G.'s release because of preadmission procedural errors—the length of stay and the notice of admission. After closing arguments, the ALJ denied M.G.'s motion for release, finding that procedural deficiencies were not "prejudicial to [M.G.]" and did not require her release. Addressing the primary violation—that [M.G.] was in the emergency room allegedly for 41 hours—the ALJ found:

14

Dr. Mirmirani testified about the uniqueness of this hospital's emergency room, having a 23-hour stabilization bed where [M.G.] apparently spent some time. That doesn't really circumvent the necessity of getting the patient out of the emergency room if she's going to be admitted to a psychiatric unit. But it does show that she -- **even if she was in that unit for 41 hours, which is not really established by any evidence, she hasn't been prejudiced by it**, nor has she been prejudiced by any possible failure to inform her of her admission status or her rights.

As I said, she is represented. She is here at the hearing. She has the same outlook as far as being released or retained as she would have if all those procedures were followed. I'm not sure that they weren't followed. So, I do not grant the motion for release based on any procedural errors. So, I find that any procedural errors, if there were any, are not of such magnitude as to require the patient's release.

(Emphasis added). Then the ALJ made express findings pertaining to each involuntary admission element enumerated in Health-Gen. § 10-632(e)(2)(i)-(v). First, the ALJ found that M.G. had "substance abuse psychosis with possible underlying schizophrenia." Second, the ALJ determined that M.G. required inpatient care and treatment. Third, the ALJ concluded that M.G. was a danger to herself because, among other reasons, an officer found her walking in traffic unaware of her surroundings. Fourth, he concluded that J.H. was unwilling and unable to be voluntarily admitted. Lastly, the ALJ determined that there was no available less restrictive form of intervention because M.G. was still psychotic and she lacked insight and judgment. After announcing his findings, the ALJ ordered the involuntary admission of M.G.

### 4.    B.N.'s Involuntary Admission Hearing

B.N.'s family member petitioned for her emergency evaluation on December 30, 2015. On January 13, 2016, an ALJ held an involuntary admission hearing. This time, as a preliminary matter, B.N.'s counsel asserted his argument that the Hospital had the burden

15

of proof to establish compliance with the preadmission procedures in Health-Gen. § 10-601 *et seq.* before the parties could address the merits (the five elements enumerated in Health-Gen. § 10-632(e)(2)). The Hospital's position was that it bore the burden of proof, by clear and convincing evidence, to establish the five elements contained in Health-Gen. § 10-632(e)(2), but neither the statute nor the corresponding regulation placed the burden on the Hospital to establish compliance with the preadmission procedures.

The ALJ reviewed the applicable regulations and determined that COMAR 10.21.01.09G is silent as to which party bears the burden of proof as to the preadmission procedures and the applicable evidentiary standard for proving whether the Hospital followed those procedures (i.e., by clear and convincing evidence or by a preponderance of the evidence). Without placing the burden of proof on either party or articulating the applicable evidentiary standard, the ALJ then requested that the Hospital present testimony regarding the preadmission procedures followed by the Hospital.

The Hospital called its only witness, Dr. Maddineni, B.N.'s treating physician and a board certified doctor in the field of psychiatry. He testified that B.N.'s family member petitioned for her emergency evaluation on December 30, 2015, and that she was brought to the Hospital on January 1, 2016. B.N. was evaluated in the emergency room on the same day at 11:30 a.m. After she was medically cleared in the emergency room, B.N. was transferred to the Assessment Stabilization Center ("ASC"), which is part of the psychiatric emergency room. On January 2, 2016, Dr. Rahman evaluated B.N. and determined that she qualified for involuntary admission. Dr. Rahman took the steps to transfer B.N. to the inpatient unit on January 2, 2016; however, there were no available inpatient beds at the

16

Hospital or any nearby facilities. B.N. remained in the ASC until she was admitted to the inpatient unit on January 4, 2016.

In regard to the prerequisites in Health-Gen. § 10-632(e)(2), Dr. Maddineni testified that B.N. was presenting manic symptoms—rapid speech, flood of ideas, extremely disorganized, irritable, agitated, and insomnia—and psychotic symptoms—hearing voices, actively hallucinating, paranoid delusions, and religious delusions. For example, B.N. had the delusion that "God healed her of all medical and psychological problems" including her HIV, hypertension, and bipolar disorder such that she no longer requires medication. Because of these symptoms, Dr. Maddineni opined that B.N. needed inpatient treatment. Dr. Maddineni testified that B.N.'s failure to manage her HIV and hypertension with medication could result in contracting AIDS, or an increased opportunity for infections, a stroke, or organ failure. B.N. was not voluntarily taking her medication and was not cooperating with treatment. Additionally, Dr. Maddineni testified to an instance on January 8, 2016, in which B.N. required involuntary medication because she became agitated, hallucinated, invaded the personal space of other patients and staff, and accused other patients and staff of trying to harm her. In addition to being a danger to herself, Dr. Maddineni testified that B.N. threatened other patients and staff. In Dr. Maddineni's opinion, there was no less restrictive form of psychiatric care appropriate for B.N.

After the Hospital rested its case, B.N.'s counsel moved for B.N.'s release, reiterating that there were preadmission procedure violations, including "there was no indication [B.N.] was given her notice of admission status [and] no indication [B.N.] was ever given her notice of the hearing." Further, B.N.'s counsel argued that B.N had

17

remained in the emergency room for 75 or 76 hours.  The ALJ then permitted the Hospital to reopen its case to conduct a re-direct examination of Dr. Maddineni.

On re-direct, Dr. Maddineni testified that the Hospital completed the application for involuntary admission on January 4, 2016; that the application provided B.N. with notice of a hearing; and that the Hospital gave B.N. the notice on January 4, 2016.  At the completion of this redirect testimony, counsel for the Hospital asked:

| [Hospital's Counsel:] | Your Honor, are there any other items that we need to address procedurally? |
| --- | --- |
| Judge: | Any questions from the doctor on -- based on that testimony, [counsel for B.N.]? |
| [B.N.'s Counsel:] | No, Your Honor. |

The only witness who testified in B.N.'s case was B.N. herself.  She testified that she was not a danger to herself or others; and that she "is not a psychiatric patient" and she "[doesn't] have problems like [schizophrenia]."  B.N.'s counsel proceeded to raise, through argument, additional procedural violations not raised earlier in the hearing without asking his witness or the Hospital's witness, Dr. Maddineni, any questions about the alleged violations.   He argued that Dr. Maddineni's testimony did not establish that B.N. was evaluated within six hours of admission as required by Health-Gen. § 10-624(b)(2).  He also asserted that B.N.'s hearing was not held within the 10-day statutory period because she was brought to the hospital on January 1, 2016, for an emergency evaluation, and that the hearing was held on January 13, 2016.

At the conclusion of the hearing, the ALJ announced his findings, determining that there were no procedural violations and that all of the conditions for admission were met

18

by clear and convincing evidence. With respect to the procedural violations raised by B.N.'s counsel, the ALJ found that although B.N. spent 75-76 hours in the emergency room—well in excess of the 30-hour statutory limit—the violation did not warrant release because there was "no other available space in any other hospitals for her." Regarding the 10-day hearing requirement, the ALJ found that B.N.'s hearing occurred within the 10-day statutory requirement because although B.N. was brought to the inpatient unit for emergency evaluation on January 1, after 75-76 hours she was admitted to the Hospital on January 4, and the hearing was held on January 13, 2016.

On the merits, the ALJ made express findings on each element contained in Health-Gen. § 10-632(e)(2) that: 1) B.N. had schizophrenia and bipolar disorder; 2) B.N. required inpatient care and treatment; 3) there was no less restrictive form of intervention because B.N. would not seek out mental health care or take medication on her own, 4) B.N. was unwilling to voluntarily admit herself; and 5) B.N. was a danger to herself because of her inability to sleep and seek treatment. He found that she was possibly a danger to others because of her manic and agitated behavior. The ALJ then ordered the involuntary admission of B.N.

### B.    Judicial Review in the Circuit Court

On September 28, 2015, J.H., C.B., and M.G. separately petitioned the circuit court for judicial review and jointly filed a motion to consolidate their cases on November 19, 2015. The Hospital consented to the consolidation, which the circuit court granted on December 7, 2015. On January 19, 2016, B.N. petitioned the circuit court for judicial review. B.N.'s counsel—who represented all Appellants during their involuntary review

19

hearings—moved to join the consolidated cases on February 2, 2016, and the circuit court granted this motion on February 23, 2016.[7]

After hearing argument on March 16, 2016, the circuit court issued its memorandum opinion and order affirming the ALJ's determinations in each case on June 14, 2016. The circuit court concluded that during the involuntary admission hearings, the Hospital was only required to prove the relevant Health-Gen. § 10-632 elements because "[n]either [Health-Gen.] § 10-632 nor COMAR 10.21.01.09 mention that the facility has a burden to produce evidence of procedural compliance with any other conditions." The circuit court also concluded that COMAR 10.21.01.09G(3) "affirmatively placed the burden of production on the individual patient to raise the issue and produce evidence of a substantial procedural error." Although the circuit court noted that Appellants' counsel "broadly raised the possibility of numerous procedural errors," counsel failed to "provide evidence to establish exactly what, if any, procedural errors actually occurred that required [Appellants'] release." The order was docketed on June 22, 2016.

Appellants noted their timely appeal on July 11, 2016.

---

[7] While we are not bound by the circuit court's decision to consolidate the cases, we will maintain the consolidation for our review. Appellants' cases share common questions on appeal regarding whether the preadmission procedures are jurisdictional and which party bears the burden of proof with respect to the Hospital's compliance with those procedures, but Appellants' cases differ with respect to the alleged preadmission procedure violations and which violations were raised with particularity. As we explain in Part I.E, J.H., unlike C.B., M.G. and B.N., failed to raise the alleged preadmission procedure violations timely and with particularity.

**DISCUSSION**

**I.**

Appellants contend that the ALJ erred by ordering the involuntary admission of Appellants without first finding that the Hospital complied with the preadmission procedures contained in Health-Gen. § 10-601 *et seq.* Appellants' argument, reframed for clarity, is that the preadmission procedures are procedural safeguards, such that noncompliance results in "a substantial deprivation of due process" prohibiting involuntary admission. Appellants assert that establishing the Hospital's compliance with the preadmission procedures is a "jurisdictional prerequisite." The Hospital counters that a plain reading of the involuntary admission statute indicates that a hospital is required to prove only the elements enumerated in Health-Gen. § 10-632(e).

Whether hospitals are required to affirmatively prove compliance with preadmission procedures during involuntary admission hearings presents a novel question. Before we undertake an analysis of Title 10, Subtitle 6 of the Health General Article and its concomitant regulations, we consider the history that culminated in their passage.

**A. The Evolution of Law on Involuntary Admission in Maryland**

During the 1960s and 1970s, the purpose of involuntary commitment changed from "achieving social control by compelling treatment" to an emphasis on individuals' constitutionally protected right to liberty. Donald H. J. Hermann, *Barriers to Providing Effective Treatment: A Critique of Revisions in Procedural, Substantive, and Dispositional*

*Criteria in Involuntary Civil Commitment*, 39 Vand. L. Rev. 83, 85 (1986).[8]  The shift toward protecting the constitutional rights of individuals facing involuntary commitment is reflected, for example, in the Supreme Court's decision in 1967 in *Specht v. Patterson*, 386 U.S. 605 (1967).  The *Specht* case involved a petitioner who had been convicted for indecent liberties under one Colorado statute that carried a maximum sentence of 10 years, but who was then committed under another Colorado sex offender statute for an indeterminate term of "from one day to life" without notice and full hearing.  *Id.* at 607.  Specht filed a writ of habeas corpus, which was dismissed by the trial court and affirmed by the Court of Appeals.  The Supreme Court reversed, recognizing that "[t]hese commitment proceedings whether denominated civil or criminal are subject both to the Equal Protection Clause of the Fourteenth Amendment  . . .  and to the Due Process Clause."  *Id.* at 608 (citation omitted).

In 1975, the Supreme Court considered an action brought under 42 U.S.C. § 1983 by Mr. Donaldson, who, at the initiation of "his father, who thought that his son was suffering from 'delusions,'" was confined as a mental patient in a Florida State Hospital in 1957 and kept in custody there against his will for nearly 15 years.  *O'Connor v. Donaldson*, 422 U.S. 563, 564–66 (1975). Throughout his confinement Mr. Donaldson repeatedly, but unsuccessfully, demanded his release.  *Id.*  Donaldson's challenge was not to the initial commitment, but instead, focused upon the nearly 15 years of confinement

---

[8] Mr. Hermann explains that, historically, an individual's civil rights in this regard were limited "in favor of achieving social control by compelling treatment in conformity with the police power and a *parens patriae* policy."  Hermann, *supra*, at 85.

that followed. *Id.* at 567. A jury in the United States District Court for the Northern District of Florida found that O'Connor, the hospital superintendent, and others, violated Mr. Donaldson's constitutional right to freedom and the Court of Appeals affirmed. In the Supreme Court, Justice Stewart writing for the majority queried, "may the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric." *Id.* at 567. The Court held that "mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. . . . In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Id.* at 576.

In Maryland, the development of the right to procedural due process for persons involuntarily committed occurred during the 1970s and the early 1980s. Prior to this change in the law, regulations did not provide, for example, for mandatory involuntary admission hearings before patients were formally admitted to inpatient psychiatric facilities. *See* Neil Solomon, *Involuntary Commitment and Due Process: The New Maryland Regulations*, 3 Md. L. F. 115, 115–16 (1973) [hereinafter Solomon, Involuntary

Commitment].[9]  Rather, Maryland employed an *ex parte* commitment procedure.[10]  Before

he became a judge, then-practicing attorney Howard S. Chasanow commented a decade

before the law finally changed in Maryland, that Maryland "permit[ted] an indeterminate

commitment without a judicial hearing[,]" and that "[t]he problem of hospitalization of the

mentally ill is one that is ever growing in scope, and because of its magnitude, should be

of vital interest to doctors and lawyers as well as the general public."  Howard Chasanow,

*Civil and Criminal Commitment of the Mentally Ill in Maryland*, 21 Md. L. Rev. 279, 279,

281 (1961).  Chasanow acknowledged that the primary criticism of *ex parte* commitment

procedures was "that they [we]re unconstitutional as violative of the Due Process clause of

the Fourteenth Amendment."  *Id*. at 282–84.  Although he ultimately concluded in that

article that Maryland's involuntary commitment laws were adequate to protect the rights

of patients, he foreshadowed the need to promulgate the very regulations at issue in this

appeal, observing that Maryland should develop "some type of emergency commitment

procedure for those in need of immediate treatment but who do not submit to examination

---

[9] Neil Solomon, M.D., Ph.D., was the Secretary of the Department of Health and Mental Hygiene ("DHMH") for the State of Maryland from 1969 to 1979.  Maryland Manual Online, Former Secretaries, http://msa.maryland.gov/msa/mdmanual/09dept/html/biosf.html (last visited July 25, 2017).  In his capacity as Secretary, Solomon was the named defendant in *Anderson v. Solomon*, 315 F. Supp. 1192 (D. Md. 1970) and in *Johnson v. Solomon*, 484 F. Supp. 278 (D. Md. 1979), both cases discussed *infra*.

[10] Once a patient was committed, "no one was charged with the duty of looking out for the interests of those patients" who were involuntarily admitted.  Solomon, Involuntary Commitment, *supra*, at 116.  Instead, after involuntary admission, a patient had to seek his or her own release through a habeas corpus petition or a petition for a judicial hearing.  *Id.*

at the request of near relatives or friends[.]"[11]  *Id*. at 305.

A class action filed in the United States District Court of Maryland in 1970 while Neil Solomon served as Secretary of DHMH precipitated the ensuing regulatory reforms. *Anderson v. Solomon*, 315 F. Supp. 1192 (D. Md. 1970); *see* Solomon, Involuntary Commitment, *supra*, at 116.  In *Anderson*, a class of patients involuntarily admitted to state mental institutions challenged the constitutionality of the involuntary commitment statute (then codified at Article 59, §§ 12-13), that permitted their involuntary admission without a hearing or any due process of law. *Id*. at 1193.  The State moved to dismiss the complaint

---

[11] During his tenure on the Court of Appeals, Judge Chasanow had the opportunity to revisit this topic in a slightly different context.  In *Bergstein v. State*, 322 Md. 506 (1991), Judge Chasanow, writing for the Court, recognized a committed individual's constitutionally protected right to liberty.

Bergstein was committed to DHMH as a result of being found not guilty by reason of insanity. *Id*. at 510.  After a period of time DHMH granted Bergstein conditional release. *Id*. at 511.  After Bergstein violated the terms of his release, the state's attorney filed a petition to revoke his conditional release, which the DHMH hearing examiner granted. *Id*. Bergstein unsuccessfully sought judicial review in the circuit court, and then noted an appeal to this Court. *Id*. at 514.  The Court of Appeals decided to hear the case before this Court issued its decision. *Id*.

Bergstein's primary contention on appeal was that his due process rights were violated when the DHMH hearing examiner relied on hearsay evidence. *Id*.  The Court ultimately held that reliable hearsay evidence "is admissible at a hearing to revoke conditional release of an individual who was committed to a mental health facility after being found not guilty of a crime by reason of insanity." *Id*.  In deciding this case, however, Judge Chasanow noted the distinction between violations of probation, which result in criminal proceedings, and violations of conditional release, which may result in recommitment. *Id*. at 516.  Judge Chasanow recognized that "[c]onditional release . . . is not a tool of the penal system." *Id*.  Instead, "it is a therapeutic release of a mentally ill individual from a psychiatric hospital as part of a continuing course of treatment[,]" such that "the deprivation of liberty involved in the initial hospitalization or in rehospitalization clearly is not imposed as a punishment." *Id*.  Thus, he explained, a patient's violation of conditional release does not automatically result in recommitment. *Id*.  The test for recommitment after a violation of conditional release is whether the patient is a danger to him or herself or society. *Id*.

on the grounds that the General Assembly had enacted recent changes to Article 59 effective July 1, 1970. *Id.* Acknowledging that Article 59 had been completely rewritten (*see* 1970 Md. Laws, ch. 407 (S.B. 210)), the Court denied the motion to dismiss, reasoning that the allegations in the complaint were still applicable to the revised law. *Id.* The Court explained that a "particularly serious constitutional question [was] raised by those provisions in both the old and the revised law which permit the involuntary commitment of persons for an indefinite period on the certificate of two physicians, without a prior judicial or administrative hearing, or a mandatory subsequent judicial or administrative hearing." *Id.* at 1194 (footnote omitted). The Court then identified the statutory provisions, which raised constitutional concerns. *Id.* First, the revised statute "d[id] not provide for a mandatory hearing, at any time, for persons who have been involuntarily committed[.]" *Id.* The Court opined that "[i]t can hardly be doubted that procedural due process requires that a hearing be held at some reasonable point in time before a person can be indeterminately committed." *Id.* (citations omitted). Second, it "d[id] not require that a check be made by an independent agency (legal, medical or administrative) charged with the duty of looking out for the interests of patients unable for one reason or another to institute and prosecute such proceedings as necessary to protect their rights." *Id.* Third, the revised statute limited involuntary admission to people requiring treatment for the protection of themselves or another, but the statute did not require the physicians' certification to include that

26

determination.[12]  *Id.* at 1194–95.

The *Anderson* class-action suit prompted the Office of the Attorney General to conduct a study of Maryland's existing involuntary civil commitment procedures. Solomon, Involuntary Commitment, *supra*, at 116.  According to Solomon's article, the Office of the Attorney General concluded that Maryland's involuntary commitment law was likely unconstitutional and the law should be updated to "afford greater protection" to involuntarily admitted patients.  *Id.*

Following *Anderson*, Maryland's involuntary admission procedures first appeared as regulations published by DHMH.[13]  The regulations were signed on June 12, 1973, and became effective October 1, 1973.[14]  A primary focus in revising the involuntary admission

---

[12] This is now a requirement in Health-Gen. § 10-616(a)(2)(iii) (The physicians' certificates must contain "[a]n opinion that admission to a facility . . . is needed for the protection of the individual or another.")

[13] Effective July 1, 2017, the "Department of Health and Mental Hygiene" has been renamed as the "Maryland Department of Health."  2017 Md. Laws, ch. 214 (S.B. 82).

[14] The regulations appeared in the Maryland Agency Rules and Regulations ("MARR") publication in 1974.  *See* MARR 10.04.03.03G (1974).  MARR was the first attempt by the Secretary of State's Office to adopt a uniform codification system for regulations.  Richard J. Colbourn & Dennis Schnappe, *Research Guide for Maryland Regulations*, Division of State Documents, 2 (1992).  For a number of reasons, including the lack of authority of the Secretary of State's Office to do more than establish publishing guidelines, this effort was unsuccessful and left incomplete.

In 1974, the General Assembly passed the State Documents Law, now codified in the State Government Article of the Maryland Code, formalizing the rule-making process by which regulations are created.  Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG"), § 7-201 *et seq.*; Colbourn, *supra*, at 2.  Judge Wilner, writing for the Court of Appeals, explained that "the principal purpose of [the State Documents Law] was to create the *Maryland Register* (Register) as a mechanism for giving public notice of certain agency actions, including the proposed and final adoptions of regulations, and COMAR, to serve as a permanent repository of agency regulations."  *Delmarva Power*

27

regulations was creating procedures to protect a patient's due process rights.[15]  Added to

the law were new procedural safeguards, including the requirement of a mandatory hearing

conducted by a hearing officer[16] within 5 working days of confinement and optional

periodic review hearings at the request of the patient.  MARR 10.04.03.03G (1974).  The

regulations placed the burden on the State, by clear and convincing evidence, to establish

at the involuntary admission hearing that the patient had a mental illness, required inpatient

treatment, and was a danger to him or herself or others.  *Id.*; *see also* Solomon, Involuntary

---

*& Light Co. v. Pub. Serv. Comm'n of Md.*, 370 Md. 1, 24 (2002).
    The involuntary admission regulations, therefore, although effective in 1973, first appeared in COMAR in 1978.  *See* COMAR 10.21.01.09 (1978).

[15] Solomon articulated these considerations in his article:

> The first major question facing [DHMH] in formulating the new regulations concerned the point in time which would be most appropriate for setting the hearing to determine the propriety of an involuntary admission.  Due process considerations naturally suggested a pre-admission hearing in order that absolutely no deprivation of liberty would be imposed before the State had proven that such confinement was necessary. . . . The due process argument that a pre-confinement hearing is required must be weighed in light of the resulting difficulties in carrying out such necessary evaluations.

* * *

> The balancing process among the various interests and rights at stake led [DHMH] to devise an arrangement whereby an individual would be temporarily confined at an appropriate facility, after which a series of procedures would be initiated to preserve the due process rights of the proposed patient.

Solomon, Involuntary Commitment, *supra*, at 116.

[16] A hearing officer is "any impartial officer designated by the Secretary of [DHMH] to conduct and make administrative decisions after the hearing is held[.]"  MARR 10.04.03.02D (1974).

Commitment, *supra*, at 117. Through these regulations, DHMH attempted to strike a balance between protecting the rights of patients who were involuntarily admitted, and "society's interest in minimizing potential injury to its members by involuntarily hospitalizing persons genuinely in need of care or treatment for the protection of themselves or others." Solomon, Involuntary Commitment, *supra*, at 118. At the time Solomon published his article, the parties to *Anderson* agreed to settle the case in light of the revisions to the regulations, pending the court's approval. *Id.* at 116.

In 1979, another lawsuit against Dr. Solomon in his capacity as Secretary, *Johnson v. Solomon* triggered the next wave of reforms. 484 F. Supp. 278 (D. Md. 1979). A class action was initiated on behalf of children in civil confinement. *Id.* at 280. The class alleged that its members were "denied periodic review as to whether continued hospitalization is necessary" once civilly committed. *Id.* at 281. The class argued, *inter alia*, that the lack of mandatory periodic review ("meaning a review that is automatically initiated by the court at the appropriate time rather than having to wait for the committed person . . . to initiate such review") in the Maryland Juvenile Causes Act and State civil commitment laws violated the Fourteenth Amendment due process rights of the litigants and all members of the class. *Id.* at 288. The Court found that "[s]ince commitments must now be made in terms of constitutionally adequate standards, mandatory periodic review is a necessary complement to this overall approach." *Id.* at 290 (footnote omitted). Accordingly, the Court concluded that "the absence of a mandatory review of juveniles committed to mental institutions by juvenile courts is unconstitutional." *Id.* at 313. The Court ordered the State to "adopt a review process satisfying constitutional

prerequisites[.]" *Id.* at 313.

DHMH then amended the regulations in 1981. *See* 8 Md. Reg. 1635 (Oct. 2, 1981) (notice of final regulations on involuntary admission to mental health facilities and adoption by the Secretary of DHMH); 8 Md. Reg. 1244–46 (July 10, 1981) (notice of re-proposed regulations on involuntary admission to mental health facilities); 7 Md. Reg. 2268–71 (Nov. 28, 1980) (notice of proposed regulations on involuntary admission to mental health facilities). The 1981 revisions required, among other things, that the record must demonstrate by clear and convincing evidence three additional elements to establish that a patient qualified for involuntary commitment. COMAR 10.21.01.07M (1981); 7 Md. Reg. 2271 (Nov. 28, 1980). Thus, in addition to establishing that the person 1) had a mental disorder, 2) was in need of institutional inpatient care or treatment, and 3) presented a danger to him or herself or others, the new regulations also required that the record demonstrate that 4) the patient was unwilling or unable to be voluntarily admitted, 5) there is no less restrictive form of treatment available, and, 6) for patients over 65 years of age, an additional evaluation was conducted. *Id.*

In 1982, the General Assembly re-codified the State's health laws into the Health-General Article (civil commitment laws are located in Title 10) and simultaneously codified the involuntary admission regulations in the new statute. *See* Comm'n to Revise Annotated Code Report on H.B. 200 (Dec. 10, 1981). The purpose of this "revision" was to "basically codif[y] the most significant parts of current agency regulation." Summary of S.B. 437, Bill File (1982). The 1981 regulations governing involuntary admissions and the corresponding statute enacted in 1982—Health-Gen. § 10-601 *et seq.*—remain

30

substantially the same today.

## B. Standard of Review

We next consider the applicable standard of review, which, in this appeal, requires some statutory interpretation.

Although a well-reasoned opinion in the circuit court is clearly helpful to the parties and this Court on appeal, our review is limited to the ALJs' decisions in the underlying cases. *Bd. Of Physician Quality Assurance v. Banks*, 354 Md. 59, 68–69 (1999) (citing *United Parcel v. People's Counsel*, 336 Md. 569, 576–77 (1994)); *see also Comptroller of Md. v. Miller*, 169 Md. App. 321, 343 (2006). We apply a different standard to the ALJs' findings of fact from the standard we apply to their conclusions of law. In regard to the findings of fact, our role "'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings[.]'" *Banks*, 354 Md. at 67–68 (quoting *United Parcel*, 336 Md. at 577). Our review of the ALJs' conclusions of law is not so narrow—especially in the context of the underlying involuntary admission hearings. We explain.

Ordinarily, when a commission or board of review within an administrative agency sits in a quasi-judicial role in a contested case, appellate courts accord deferential review to the decision of that commission or board interpreting the agency's enabling statute and the corresponding regulations. *See Adventist Health Care Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 118–120 (2006). Chief Judge Bell, writing for the Court of Appeals in *Adventist*, thoroughly explained the rationale for this:

Administrative agencies possess an "expertise" and, thus, have a greater

31

ability to evaluate and determine the matters and issues that regularly arise, or can be expected to be presented, in the field in which they operate or in connection with the statute that they administer.

\* \* \*

Moreover, "th[e] authority delegated to executive branch agencies may include a broad power to promulgate legislative-type rules or regulations in order to implement the statute. Such rules or regulations will often, of necessity, embody significant discretionary policy determinations." *Christ v. Dep't of Natural Resources*, 335 Md. 427, 445 (1994). This Court has stated that, in the exercise of that authority, "[a] great deal of deference is owed an administrative agency's interpretation of its own regulation." *Maryland Transp. Authority v. King*, 369 Md. 274, 288 (2002). Furthermore:

> "[A]gency rules are designed to serve specific needs of the agency, are promulgated by the agency, and are utilized on a day-to-day basis by the agency. A question concerning the interpretation of an agency's rule is as central to its operation as an interpretation of the agency's governing statute. Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's statute than to the interpretation of its governing statute."

*Md Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 593 (1983). *See also Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 477 n.6 (2003) ("[A]n agency is best able to discern its intent in promulgating a regulation. Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference [citations omitted]"); *Maryland Transp. Authority v. King*, 369 Md. 274, 288–289 (2002) ("[A]n agency's interpretation of an administrative regulation is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' [citations omitted]").

*Id.*

The rationale undergirding the deference normally accorded agencies in interpreting the statutes and regulations they administer does not apply to the ALJs' decisions in the underlying cases. In other administrative review regulatory schemes by which the Office

32

of Administrative Hearings ("OAH") is delegated authority to conduct hearings on behalf of an agency or commission, the ALJ typically issues a recommended decision, which the agency or commission may adopt, modify, or reject; *see, e.g.*, COMAR 31.02.01.09-1 (Maryland Insurance Administration); or, the applicable regulation permits a party to appeal a final decision by an ALJ to a commission or board within the agency, *see* COMAR 14.03.01.12 (Regulation provides for review of decisions issued by an ALJ by the Appeal Board of the Commission on Human Relations). A party may then file a petition for judicial review of the final agency decision in the circuit court.

Here, the administrative agency has no role in involuntary admission hearings other than as a party. In 1992, DHMH promulgated regulations assigning the role of the impartial hearing officer to OAH.[17] *See* 19 Md. Reg. 1708 (Sept. 18, 1992) (notice of final rule); 19 Md. Reg. 1319-26 (July 10, 1992) (notice of proposed rule); *see also* COMAR 10.21.01.09A ("An ALJ from the OAH shall conduct a hearing at the inpatient facility[.]"). Moreover, appellate review of involuntary admission hearings has been in the exclusive jurisdiction of the courts since 1982. The statute states specifically that:

> (a) The Board of Review does not have jurisdiction to review the

___

[17] Between 1973 and 1992, an impartial hearing officer designated by the Secretary of DHMH conducted the involuntary admission hearings. MARR 10.04.03.02D (1974). In 1989, however, the General Assembly formed the OAH as an independent agency created to adjudicate administrative hearings in response to the findings and recommendations of the Governor's Task Force on Administrative Hearing Officers commissioned by then-Governor William Schaefer. *See Final Report of the Governor's Task Force on Administrative Hearing Officers*, (June 28, 1998) (explaining that the Task Force was formed to investigate concerns that parties "may not receive a fair hearing before [a] Hearing Officer" because "these Hearing Officers are subject to the control and supervision of the agency which as rendered a decision or taken some action that is the subject of the appeal heard by the Hearing Officer"); 1989 Md. Laws, ch. 788 (S.B. 658).

determination of a hearing officer on an involuntary admission under this subtitle.

(b) The determination of the hearing officer is a final decision of the Department for the purpose of judicial review of a final decision under the Administrative Procedure Act.

Health-Gen. § 10-633(a)-(b). Although DHMH has its own Board of Review, this Board had never possessed jurisdiction to review involuntary admission hearing determinations.[18]

The independence ALJs retain in involuntary admission decisions may, perhaps, warrant even greater deference in reviewing their factual findings. Because ALJs are situated outside of and independent from DHMH, however, without the subject matter expertise traditionally present when an agency sits in the quasi-judicial role, we should not afford deference to the ALJs' legal interpretations of the involuntary admission statutes and the concomitant regulations promulgated by DHMH. Accordingly, we review all of the ALJs' legal conclusions *de novo*.

### C. Preadmission Procedural Requirements

Title 10, Subtitle 6 of the Health-General Article contains provisions governing civil commitment generally, including voluntary admission, involuntary admission, and emergency evaluations. An individual with a mental illness may apply voluntarily for admission to a hospital. *See* Health-Gen. § 10-609. An individual may also be involuntarily admitted, either by application for involuntary admission by "any person who

---

[18] During the 2017 Session, the General Assembly passed a law to phase out the Board of Review of DHMH and ultimately repeal the Board of Review in its entirety. 2017 Md. Laws, ch. 103 (H.B. 127). The repeal provisions take effect January 1, 2018.

has a legitimate interest in the welfare of the individual," Health-Gen. § 10-614, or, by a petition for emergency evaluation under Health-Gen. §10-624.

All four Appellants were brought to the Hospital on petitions for emergency evaluation and so we undertake a review of the preadmission procedures applicable to petitions for emergency evaluations. A peace officer or person in a profession listed in Health-Gen. §§ 10-622(d) and 10-623(a), or any other interested person, may petition for the emergency evaluation of an individual "if the petitioner has reason to believe that the individual: [h]as a mental disorder; and [t]he individual presents a danger to the life or safety of the individual or of others." Health-Gen. § 10-622(a). A peace officer "shall take an emergency evaluee to the nearest emergency facility" upon a petition signed by a peace officer or a professional. Health-Gen. § 10-624(a).

When the petitioner is not a peace officer or one of the professionals enumerated in Health-Gen. § 10-623(a), the petition must be presented to the court for immediate review. If the court makes a finding of probable cause "that the emergency evaluee has shown the symptoms of a mental disorder and that the individual presents a danger to the life or safety of the individual or others," then the court shall endorse the petition. Health-Gen. § 10-623(b). Once a petition is endorsed by the court, a peace officer must take the individual to the nearest emergency facility for evaluation. Health-Gen. § 10-624(a). If the petition lacks probable cause, "no further action may be taken under the petition." Health-Gen. § 10-623(c).

The emergency facility is required to accept the individual if the petition is properly executed. Health-Gen. § 10-624(b)(1). The facility must evaluate the individual within 6

35

hours after the individual is brought to the facility "to determine whether the emergency evaluee meets the requirements for involuntary admission." Health-Gen. § 10-624(b)(2). The facility must release the individual unless the individual requests voluntary admission or meets the requirements for involuntary admission.[19] Health-Gen. § 10-624(b)(3). An emergency facility may not keep an individual for more than 30 hours. Health-Gen. § 10-624(b)(4).[20]

If an individual qualifies for involuntary admission and refuses to agree to voluntary admission, "the examining physician shall take the steps needed for involuntary admission of the emergency evaluee to an appropriate facility[.]" Health-Gen. § 10-625(a). Within 6 hours of receiving notification, DHMH is required to admit the individual to an

---

[19] The requirements for involuntary admission under Part III of Subtitle 6 are actually presented as limitations. The statute reads: "A facility . . . may not admit the individual . . . unless:

(1) The individual has a mental disorder;
(2) The individual needs inpatient care or treatment;
(3) The individual presents a danger to the life or safety of the individual or of others;
(4) The individual is unable or unwilling to be admitted voluntarily; **and**
(5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

Health-Gen. § 10-617(a) (emphasis added). There are additional limitations for individuals who are 65 or over, which are not pertinent to this appeal because none of the Appellants are 65 years of age or older. *See* Health-Gen. § 10-617(b).

[20] This Court undertook a review of Maryland's statutory scheme for involuntary admission in effect in 2003. *See Furda v. State*, 193 Md. App. 371, 411 (2010). Judge Hollander, writing for this Court, considered whether an emergency mental health evaluation conducted pursuant to Health-Gen. § 10-620 to -630 constitutes a commitment under federal law, *id.* at 376, and concluded that "the term does not extend to a brief hospitalization for purposes of an emergency mental health evaluation." *Id*. at 410–11.

appropriate inpatient facility. Health-Gen. § 10-625(b)(2). Then, within 12 hours of an individual's initial admission, the inpatient facility is required to give the individual a notice of the admission status and notice of involuntary admission hearing rights, including the right to call or write a lawyer and the availability of legal aid and lawyer referral services. Health-Gen. § 10-631(a)-(b).

Within 10 days of an individual's confinement at an inpatient facility under Health-Gen. § 10-625, whether the confinement be through an application for involuntary admission or a petition for emergency evaluation, OAH shall conduct a hearing "to determine whether the individual is to be admitted to a facility . . . as an involuntary patient or released without being admitted." Health-Gen. § 10-632(b); COMAR 10.21.01.09A. The individual remains in observation status until she is formally admitted into an inpatient hospital following an involuntary admission hearing. COMAR 10.21.01.07F(3); Solomon, Involuntary Commitment, *supra*, at 117 ("[W]hile an individual is on 'Observation Period' status, he [or she] is not officially or formally committed as a mental patient.").

### D. Health-Gen. § 10-632(e) and the Involuntary Admission Hearing.

Bringing Appellants' primary contention back into focus, we now examine whether the ALJ erred by ordering the involuntary admission of Appellants without first finding that the Hospital complied with the preadmission procedures contained in Health-Gen. § 10-601 *et seq.* The Hospital asserts that a plain reading of the involuntary admission statute indicates that a hospital is required to prove only the elements enumerated in Health-Gen. § 10-632(e).

We begin with the plain language of the statute and the instruction by the Court of

37

Appeals that an "ordinary, popular understanding of the English language dictates interpretation of its terminology." *Kushell v. Dep't of Nat. Res.*, 385 Md. 563, 576 (2005) (citation omitted). "'If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction.'" *Williams v. Peninsula Reg'l Med. Ctr.,* 440 Md. 573, 580 (2014) (citation omitted). Courts should not analyze individual provisions in isolation, but rather as part of a complete statutory scheme. *Outmezguine v. State*, 335 Md. 20, 41 (1994) (citation omitted). Courts aim to "avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137 (1994) (citations omitted).

The provisions governing involuntary admission are found in Health-Gen. § 10-632, which we set out in its entirety:[21]

> (a) *Right to hearing.* — Any individual proposed for involuntary admission under Part III of this subtitle shall be afforded a hearing to determine whether the individual is to be admitted to a facility or a Veterans' Administration hospital as an involuntary patient or released without being admitted.
> (b) *Time of hearing.* — The hearing shall be conducted within 10 days of the date of the initial confinement of the individual.
> (c) *Time of hearing — Postponement.* — (1) The hearing may be postponed for good cause for no more than 7 days, and the reasons for the postponement shall be on the record.

---

[21] Effective July 1, 2017, the General Assembly enacted an outpatient civil commitment ("OCC") pilot program "to allow for the release of an individual who is involuntarily admitted for inpatient treatment under [Health-Gen.] § 10-632 . . . on condition of the individual's admission into the pilot program." 2017 Md. Laws, ch. 576 (H.B. 1383). This pilot program is limited to Baltimore City at this time and meant to "improve services for individuals in Baltimore City who have a serious mental illness and have not been well served by the public behavioral health system[.]" Fiscal Note, H.B. 1383 (2017).

(2) A decision shall be made within the time period provided in paragraph (1) of this subsection.

(d) *Rules and regulations; designation of hearing officer.* — The Secretary shall:

(1) Adopt rules and regulations on hearing procedures; and

(2) Designate an impartial hearing officer to conduct the hearings.

(e) *Decision* — The hearing officer shall:

(1) Consider all the evidence and testimony of record; and

(2) Order the release of the individual from the facility unless the record demonstrates by clear and convincing evidence that at the time of the hearing each of the following elements exist as to the individual whose involuntary admission is sought:

(i) The individual has a mental disorder;

(ii) The individual needs in-patient care or treatment;

(iii) The individual presents a danger to the life or safety of the individual or of others;

(iv) The individual is unable or unwilling to be voluntarily admitted to the facility; [and]

(v) There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual;

(vi) If the individual is 65 years old or older and is to be admitted to a State facility, the individual has been evaluated by a geriatric evaluation team and no less restrictive form of care or treatment was determined by the team to be appropriate.

(f) *Notice of hearing.* — The parent, guardian, or next of kin of an individual involuntarily admitted under this subtitle:

(1) Shall be given notice of the hearing on the admission; and

(2) May testify at the hearing.

(g) *Surrendering firearms.* — If a hearing officer enters an order for involuntary commitment under Part III of this subtitle and the hearing officer determines that the individual cannot safely possess a firearm based on credible evidence of dangerousness to others, the hearing officer shall order the individual who is subject to the involuntary commitment to:

(1) Surrender to law enforcement authorities any firearms in the individual's possession; and

(2) Refrain from possessing a firearm unless the individual is granted relief from firearms disqualification in accordance with § 5-133.3 of the Public Safety Article.

Health-Gen. § 10-632. Subsection (e)(2) instructs that the hearing officer, after considering

all evidence and testimony, order the release of an individual from a hospital "unless the

record demonstrates by clear and convincing evidence that at the time of the hearing each of the [involuntary admission elements] exist as to the individual whose involuntary admission is sought[.]" In regard to the involuntary admission elements (Health-Gen. § 10-632(e)(2)), the General Assembly identified the burden of proof—clear and convincing evidence—but did not identify which party bears this burden. Notably, compliance with the preadmission procedures is not one of these elements, nor does the statute provide anywhere that the hearing officer must make findings in regard to preadmissions procedures.

Although the statute does not provide a definitive answer, it points us to another source of law—the corresponding regulations promulgated by DHMH—that provide additional instruction on how involuntary preadmission procedures are conducted. *See* Health-Gen. § 10-632(d)(1) ("The Secretary shall [a]dopt rules and regulations on hearing procedures.") The regulation pertaining to involuntary admission hearings is found in COMAR 10.21.01.09. In pertinent part, this regulation provides:

> **F. Burden of Proof. The burden of proof is on the inpatient facility to demonstrate by clear and convincing evidence** that:
> (1) The individual has a mental disorder;
> (2) The individual needs inpatient care or treatment;
> (3) The individual presents a danger to the life or safety of the individual or of others;
> (4) The individual is unable or unwilling to be admitted voluntarily;
> (5) There is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual; and
> (6) If the individual is 65 years old or older and is being referred for admission to a State inpatient facility or VA hospital, a GES team has determined that there is no available, less restrictive form of care or treatment that is adequate for the needs of the individual.

> **G. Findings and Conclusions.** After the evidence and testimony are

presented, and following summation and argument by the parties, the ALJ shall:

> (1) Consider all evidence and testimony of record;
> (2) Rule on **issues raised by the individual** that relate to the process by which the:
>> (a) **Individual was taken into and confined during observation status**;
>> (b) Individual's admission status was changed according to the provisions of Regulation .08B of this chapter; or
>> (c) Individual is presented for a semiannual hearing under the provisions of Regulation .08C of this chapter;
> (3) Order the release of the individual from the inpatient facility if:
>> (a) An error in the process occurred;
>> (b) **The error in the process is substantial; and**
>> (c) **No other available remedy is consistent with due process and the protection of the individual's rights**;
> (4) Order the release of the individual from the inpatient facility unless the inpatient facility meets the burden of proof outlined in § F of this regulation[.]

COMAR 10.21.01.09 (bold headings and emphasis added). Clearly, this regulation addresses additional procedures, rights, and responsibilities of the parties at involuntary admission hearings. First, we observe that DHMH addresses the involuntary admission elements and preadmission procedures in separate sections.

Focusing on Section F, the burden of proof is expressly placed on the inpatient facility (here, the Hospital) to establish the involuntary admission elements. COMAR 10.21.01.09F. The regulation reiterates that the burden of proof is by clear and convincing evidence. We note that Section F pertains to only the involuntary admission elements and, like the statutory provision on involuntary admission hearings, compliance with the preadmission procedures is absent from the enumeration of involuntary admission elements.

Unlike the statute, Section G of the regulation addresses how a party may raise an

41

issue regarding compliance with the preadmission procedures. *See* COMAR 10.21.01.09G. This section fills in the gap left by the statute. The regulation expressly places the burden on the individual whose involuntary admission is sought to "raise" issues "relate[d] to the process by which the: [i]ndividual was taken into and confined during observation status[.]" COMAR 10.21.01.09G(2)(a).

The regulation, however, fails to specify which party bears the burden to prove procedural compliance once the issue is raised. Viewing the statutory scheme as a whole, in light of its purpose—protecting individuals' liberty interests—it only follows that the burden of proof shifts to the hospital.[22] *See Arrington v. Dep't of Human Res.*, 402 Md. 79, 101 (2007) (holding that, where Maryland Rule 15-207(e)(4) did not specify which party bore the burden of proof, the burden is on the party with a "'peculiar means of knowledge' enabling him or her to establish the fact" (citation omitted)). This burden-shifting framework is appropriate in light of the circumstances surrounding emergency petitions for involuntary admission. The patient most likely lacks the cognition during the evaluation and observation period to document the pertinent procedural events; including his or her time of arrival at the hospital, the time of receipt of the notice of admission status, the duration between arrival and evaluation, and the duration between arrival and admission to an appropriate facility. The hospital, however, maintains and controls access to the patient's medical records, which are likely the only documentary evidence to

---

[22] At oral argument before this Court, the Hospital conceded that it bears the burden of proof once a patient raises the issue with particularity.

42

establish the hospital's compliance or non-compliance with the preadmission procedures.

The regulation also fails to identify the hospital's burden of proof for establishing its compliance with specific issues raised by the individual at the involuntary admission hearing. We look to Maryland Code (1984, 2014 Repl. Vol.), State Government Article ("SG"), § 10-217 for guidance. This provision states that "[t]he standard of proof in a contested case shall be the preponderance of the evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution." Accordingly, we conclude that the hospital has the burden of proof by a preponderance of the evidence, to establish its compliance with the specific preadmission procedures at issue.

Fortunately, the statute also addresses what the remedy should be for non-compliance. COMAR 10.21.01.09G(3) provides that the ALJ must "[o]rder the release of the individual from the inpatient facility if: (a) an error in the process occurred; (b) [t]he error in the process is substantial; and (c) [n]o other available remedy is consistent with due process and the protection of the individual's rights[.]" From this three-part test we observe that the hospital's non-compliance with a preadmission procedure does not automatically result in the release of the individual from the hospital. Establishing that an error occurred is only one part of the three-part test. *See* COMAR 10.21.01.09G(3)(a). The procedural violation only results in the individual's release from the hospital if 1) the error was substantial and 2) there is no other remedy available that is consistent with due process and the protection of the individual's rights. COMAR 10.21.01.09G(3)(b)-(c).

Based on the foregoing review of the applicable statute and regulations, we hold that the individual bears the burden at an involuntary admission hearing to raise any

preadmission procedural violations. Once the issue is raised, the burden shifts to the hospital to establish, by a preponderance of the evidence, either its compliance with respect to the alleged procedural violation, or that the violation was not substantial or that "[n]o other remedy [wa]s consistent with due process and the protection of the individual's rights[.]"[23]

### 1. The Preadmission Procedures are Not "Jurisdictional."

Appellants assert that an individual is not "lawfully in [a hospital's] custody" if the hospital failed to comply with the preadmission procedures and, as a result, the hospital's noncompliance deprives the OAH of jurisdiction to conduct an involuntary admission hearing.

Appellants' contention is essentially an issue of statutory construction similar to that addressed in *Motor Vehicle Administration v. Jones*, 380 Md. 164 (2004). In *Jones*, an ALJ suspended the respondent's driver's license because the respondent refused to submit to a chemical breath test after failing a field sobriety test during a traffic stop. *Id.* at 169. The respondent sought judicial review in the circuit court, challenging the ALJ's decision by asserting that the Motor Vehicle Administration ("MVA") must also establish at the

---

[23] We acknowledge that the Court of Appeals has held that a petitioner must be released from a mental institution and returned to prison to serve his original sentence when it concluded that a provision in the Defective Delinquent Act (since repealed) requiring the examiner to disclose the results of the psychological evaluation to the court and advise the petitioner of his hearing rights was mandatory and was not complied with. *See Moss v. Director, Patuxent Inst.*, 279 Md. 561, 568 (1977). *Moss*, however, is distinguishable from the case *sub judice* because COMAR 10.21.01.09G(3) provides that even when a patient raises a preadmission procedure issue, in order to warrant release, the error must have been substantial and "[n]o other available remedy [was] consistent with due process and the protection of the individual's rights."

suspension hearing prior to suspending an individual's driver's license, that the respondent was offered a chemical test within the two-hour statutory limitation as required under [Maryland Code (1977, 1999 Repl. Vol., 2003 Supp.), Courts and Judicial Proceedings Article ("CJP"),] § 10-303. *Id.* at 172.

The circuit court concluded that the MVA had the burden to establish compliance with the two-hour statutory limitation and that there was no evidence in the record that the test was offered within that time limit. *Id.* After the circuit court reversed the ALJ's decision, the MVA filed a petition for certiorari requesting that the Court of Appeals determine "whether § 16-205.1(f)(7)(i) implicitly requires that, in a § 16-205.1 suppression hearing, the [MVA] must also establish that the arresting officers satisfied the requirements of the provisions of [CJP] § 10-303[.]" *Id.* at 175. After applying the canons of statutory interpretation and reviewing the legislative history, the Court held that "the text of § 16-205.1(f)(7)(i) [] is clear and unambiguous and limits the issues to be considered by an ALJ in a suspension hearing to the six enumerated issues of § 16-205.1(f)(7)(i)(1-6)"—whether the test was offered within the two-hour statutory time limit was not among those six elements. *Id.* at 168, 177.

The Court reasoned that the use of the word "only" in the language of the statute—"at the hearing the *only* issues shall be"—served as a limiting word which excluded other possible elements. *Id.* at 174, 177 (emphasis added). "If the Legislature intended the ALJ to consider whether the officers requested the chemical breath test within two hours of his apprehension, it would have included a seventh factor under (f)(7)(i)." *Id.* at 177. In further support of this interpretation of the statute, the Court observed that "the Legislature

45

appear[d] to be concerned solely with the issue of whether the refusal was *informed* and not with the lapse of time between the suspect's apprehension and the test being requested." *Id.*

Applying the principles of statutory construction, we look to the plain language of Health-Gen. § 10-632—the statutory provision governing the involuntary admission hearing. Subsection 10-632(e)(2) states that "[t]he hearing officer shall . . . [o]rder the release of the individual from the facility *unless* the record demonstrates by clear and convincing evidence that at the time of the hearing *each of the following elements exist* as to the individual whose involuntary admission is sought." (Emphasis added). This subsection sets forth six elements that *must* be established before the ALJ may order the involuntary commitment of an individual. Health-Gen. § 10-632(e)(2). Similar to *Jones*, none of the preadmission procedures are included in the enumerated list of involuntary admission elements that must be established at the involuntary admission hearing. *See Jones*, 380 Md. at 177.

As discussed *supra*, DHMH promulgated revisions to the involuntary admission regulations in 1981 and the General Assembly followed suit in 1982 by enacting into the Maryland Code the procedures in the regulations to protect individuals' liberty interests. *See, e.g.*, Solomon, Involuntary Commitment, *supra*, at 115. The General Assembly intended that the "[s]ix elements must exist for the hearing officer to determine the appropriateness of the involuntary admission." Fiscal Note, S.B. 437 (1982).

Nothing in the legislative history indicates that the General Assembly intended that a hospital must demonstrate compliance with the preadmission procedures as a condition

46

precedent to ordering involuntary admission. Appellants, therefore, are incorrect in their contention that it is a "jurisdictional" prerequisite that a hospital establish compliance with preadmission procedures during an involuntary commitment hearing. Instead, a hospital must only demonstrate compliance with preadmission procedures in those cases in which the patient raises procedural irregularities with particularity.

### E. Application of Law to Each Appellant's Involuntary Admission Hearing

Appellants argue that the Hospital's errors in the preadmission procedures were substantial and required each ALJ to release each Appellant. COMAR 10.21.01.09G(3)(c). The Hospital contends that the ALJs reviewed and ruled on the preadmission procedural violations raised by Appellants under the appropriate standard articulated in COMAR 10.21.01.09G(3).

We evaluate each Appellant's contentions in turn.

### 1.    J.H.'s Involuntary Admission Hearing.

Counsel for J.H. alleged, at the outset of the hearing before the ALJ, that "we will be bringing up that the notice of admission status and the detention in the emergency room both exceeded the time limits[.]" Then, at the conclusion of the Hospital's case, he again alleged that the Hospital exceeded the statutory time limits for notifying J.H. of her notice of admission status and for the time she spent in the emergency room, and added that there was no evidence that the Hospital completed her certifications or that she was granted an involuntary admission hearing within the applicable time limits. J.H.'s counsel could not provide any factual support for these broad allegations, but maintained that it was the Hospital's burden to present evidence that the Hospital had complied with the preadmission

47

procedures specified in Title 10, Subtitle 6 of the Health-General Article and corresponding COMAR provisions.

For the reasons stated in the preceding examination of the statute and regulations governing involuntary commitment proceedings, we determine that the ALJ properly placed the initial burden on J.H.'s counsel to raise the alleged preadmission procedural violations with sufficient particularity so that the Hospital would have had the opportunity to submit evidence in response. The ALJ said "if the patient is asking for a release based on some violation of the necessary procedures, I think it's incumbent upon the patient to show that those procedures were, in fact, violated[.]" We note that J.H.'s counsel did not take the opportunity to ask Dr. Prasad, on cross-examination, about either of the alleged procedural violations. In fact, J.H.'s counsel only asked one question on cross-examination: "How did my client get to the hospital, Doctor?"

In each instance, J.H.'s counsel did not raise the procedural defects with particularity. As a result the burden did not shift to the Hospital and the ALJ was not required to make findings regarding those alleged violations. Furthermore, in regard to the requirement that patients have an involuntary admission hearing within 10 days, the ALJ concluded that even if there was a procedural violation, it did not warrant J.H.'s release, reasoning that J.H. had a hearing in a "timely fashion" and any error was not substantial. We agree, and hold that the ALJ did not err in denying J.H.'s motion for release and admitting J.H. to the Hospital.

### 2.    C.B.'s Involuntary Admission Hearing.

C.B. contends that her due process rights were infringed because the Hospital did

48

not establish compliance with the maximum allowable time for evaluation and observation in the emergency room. At the outset of the hearing, C.B.'s counsel indicated that he would "be bringing up the defect in the emergency petition and the notice of admission" without identifying any specific errors. The Hospital proceeded to examine its witness, Dr. Mirmirani, regarding the contents of the notice of admission, but had no notice of a specific allegation of error. During the cross-examination, C.B.'s counsel intimated there were errors in the notice of admission status form when he questioned Dr. Mirmirani about whether C.B.'s name was on the form, and, why the words "not applicable" were written by the petitioner (C.B.'s father) next to the question concerning whether C.B. posed a danger to herself or others. On re-direct, however, Dr. Mirmirani explained that the patient's first name was at the end of the notice of admission status form and that a nurse informed C.B. of her status. More importantly, C.B.'s father testified at the involuntary admission hearing that his daughter did pose a danger to herself and to others, and that his notation of "not applicable" on the form was probably in error. Thus, in regard to the alleged errors in the notice of admission status form and petition, C.B.'s counsel timely raised the alleged errors, and the ALJ properly shifted the burden to the Hospital. As the transcript demonstrates, the Hospital then presented evidence showing compliance with the preadmission procedures.

After the close of evidence, C.B.'s counsel attempted to raise an additional procedural violation—the time C.B. spent in the emergency room. The ALJ found that C.B. did not raise the alleged procedural violation in time and with particularity. We agree. C.B.'s counsel's bald allegation—"we don't know how long she was in the emergency

49

room[]"—during closing remarks was too little too late. Under the circumstances, the burden did not shift to the Hospital to under COMAR 10.21.01.09G(3). We hold that the ALJ did not err in denying C.B.'s motion for release and admitting C.B. to the Hospital.

### 3. M.G.'s Involuntary Admission Hearing.

M.G. contends that she was not afforded due process because the Hospital kept her in the emergency room for approximately 41 hours prior to her admission to an inpatient psychiatric unit—in excess of the 30-hour statutory limit—and that her record does not indicate that the Hospital provided her with her notice of admission status.

In this case, M.G.'s counsel did attempt to establish the duration of M.G.'s evaluation in the emergency room during his cross-examination of Dr. Mirmirani. Dr. Mirmirani testified that he was not certain exactly how long M.G. was in the emergency room, but conceded that her stay may have exceeded the 30-hour statutory maximum because she was placed in the ASC after her evaluation.

As we have explained, we defer to the ALJ's findings of fact, and if the facts in the record allow reasoning minds to reach the same determination as the ALJ, "then [the determination] is based upon substantial evidence, and the court has no power to reject that conclusion." *Liberty Nursing Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 330 Md. 433, 443 (1993). The applicable regulation provides that where an error in process is established, the ALJ must determine whether it is "substantial" and whether "there is no other remedy [] consistent with due process and the protection of the individual's rights." COMAR 10.21.01.09G. In this case, although M.G. was not transferred to an inpatient psychiatric unit within the time prescribed in the statute, the emergency room physicians

50

performed their initial evaluation and concluded that M.G. required inpatient treatment. The emergency room physicians began administering that treatment in the ASC prior to her transfer to an available bed in the inpatient unit. On this record, we hold that the ALJ's determination that the preadmission procedure violation was not substantial and did not warrant M.G.'s release was legally correct and supported by substantial evidence.

M.G.'s counsel raised the alleged errors in the notice of admission status and certifications only after the Hospital rested its case. In this case, however, the ALJ permitted the Hospital to re-open its case.[24] Dr. Mirmirani took the witness stand again and testified to the notice of admission status and the certifications procedures that the Hospital followed. Although Dr. Mirmirani could not clearly state when the emergency physician gave M.G. notice of her admission status, he did testify that two licensed physicians certified M.G. The ALJ determined that, to the extent any procedural violation was established, it was not substantial. We do not find error in the ALJ's assessment that, to the extent M.G. established any procedural violation, it was not substantial. We affirm the ALJ's rulings on M.G.'s motion for release and order admitting her to the Hospital.

### 4. B.N.'s Involuntary Admission Hearing.

B.N. contends that her due process rights were infringed because she remained in the emergency room for 76 hours, her involuntary admission hearing took place more than 10 days after her initial confinement, and she was not evaluated within 6 hours of her

---

[24] Although Appellants did not challenge this on appeal, we note that an ALJ has broad discretion to reopen a case to receive additional evidence. *See Eastern Outdoor Advertising Co. v. Mayor and City Council of Balt.*, 146 Md. App. 283, 304 (2002).

arrival.

B.N.'s counsel stated these allegations of procedural violations at the outset of the involuntary admission hearing and argued that the Hospital bore the burden to demonstrate compliance with all relevant statutory preadmission requirements before proceeding to present evidence on the merits of the case (i.e., the involuntary admission elements). The ALJ, after determining that COMAR 10.21.01.09G was silent as to which party bore the burden to prove the Hospital's compliance with preadmission procedures, instructed the Hospital "to present whatever testimony you wish to present or not on any issue that is relevant in today's hearing[.]" Without expressly stating so, the ALJ properly placed the burden on the Hospital to prove that either the Hospital complied with that preadmission procedure or the alleged errors were not substantial. *See* COMAR 10.21.01.09G(3).

With respect to the duration of time in the emergency room, Dr. Maddineni's testimony corroborated B.N.'s allegation that she spent 75 or 76 hours in the emergency room—well in excess of the 30-hour statutory time limit. Procedural violations, however, do not result in a patient's automatic release. If the Hospital can establish either that the errors were not substantial or that no "available remedy [wa]s consistent with due process and the protection of the individual's rights," the ALJ is not required to release the patient. COMAR 10.21.01.09G(3). In this case, Dr. Maddineni testified that after B.N. was evaluated in the emergency room, she was transferred to the ASC, which is part of the psychiatric unit in the emergency room, because there were no available inpatient beds. Again, we mind the deference accorded the ALJ under COMAR 10.21.01.09G(3) to determine whether a violation is substantial and whether there was "no available remedy

52

[] consistent with due process and the protection of the individual's rights." We hold that the ALJ's determination that the Hospital's violation of the 30-hour statutory maximum did not warrant B.N.'s release was supported by substantial evidence.

We also discern no error in the ALJ's ruling that there was no violation with respect to the 10-day statutory hearing requirement. B.N. was admitted to the Hospital on January 4, 2016, and the hearing was held on January 13, 2016. B.N.'s involuntary admission hearing occurred within 10 days of her admission. Similarly, we find no error in the ALJ's decision that there was no violation of the requirement that patients be evaluated within 6 hours of arrival at the Hospital. Dr. Maddineni testified that B.N. was brought to the emergency room on January 1, 2016 and evaluated at 11:30 a.m. on the same day. Although the record did not establish that B.N. was evaluated within 6 hours of her arrival, she was evaluated promptly. It was reasonable for the ALJ to conclude that any violation with respect to this preadmission procedure was not substantial.

In conclusion, we hold that the ALJ applied the legal burden of proof accurately in all four cases. We agree that J.H. did not raise her alleged preadmission procedure violations in time or with particularity and that the Hospital established its compliance with the preadmission procedures with respect to C.B. We agree with the circuit court's observation that although Appellants' counsel "broadly raised the possibility of numerous procedural errors," counsel failed to "provide evidence to establish exactly what, if any, procedural errors actually occurred that required [Appellants'] release." In regard to M.G. and B.N., the record supports the ALJs' decisions that the violations of the preadmission procedures were not substantial and there was "no other available remedy consistent with

53

due process and the protection of the individual's rights." COMAR 10.21.01.09G(3)(c). In all of four cases, the records demonstrate that the Hospital presented evidence on, and the ALJs examined, each element contained in Health-Gen. § 10-632(e)(2), establishing that the patients were suffering from serious mental illness and required inpatient treatment in order to protect them from harming themselves or others. We hold that the ALJs' decisions ordering the involuntary admissions of Appellants were legally correct and supported by substantial evidence.

**JUDGMENTS OF THE CIRCUIT COURT AFFIRMED.**
**COSTS TO BE PAID BY APPELLANTS.**